### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### GUILD INDUSTRIES MANUFACTURING CORP., and Paul A. Saad, Respondents.

### No. 19736.

United States Court of Appeals
Fifth Circuit.
July 10, 1963.

---

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Dominick L. Manoli, Associate Gen. Counsel, N. L. R. B., Melvin Pollack, Atty., N. L. R. B., Washington, D. C., Stuart Rothman, General Counsel, Robert A. Armstrong, Attorney, N. L. R. B., for petitioner.

Paul A. Saad, Granville M. Alley, Jr., of Fowler, White, Gillen, Humkey & Trenam, Raymond J. Malloy, Tampa, Fla., Warren E. Hall, Jr., Bartow, Fla., Mabry, Reaves, Carlton, Fields & Ward, Tampa, Fla., for respondents.

Before TUTTLE, Chief Judge, WOODBURY, Chief Judge * and BELL, Circuit Judge.

GRIFFIN B. BELL, Circuit Judge.

This case is before the court upon the petition of the National Labor Relations Board, pursuant to § 10(e) of the National Labor Relations Act, as amended 29 U.S.C.A. § 160(e), for enforcement of its order against Respondents Guild Industries Manufacturing Corp., and Paul A. Saad. Respondent Saad is held for activity as counsel for Guild and to that extent the order is unprecedented.

The Board found that both Respondents interfered with, restrained, and coerced Guild employees in violation of §

* Chief Judge of the First Circuit sitting by designation.

8(a) (1), 29 U.S.C.A. § 158(a) (1), of the Act by interrogating them concerning union membership and activities, and that Guild further violated § 8(a) (1) of the Act by threats of reprisal for joining the union. The Board also found that Guild violated § 8(a) (3) and (1) of the Act, 29 U.S.C.A. § 158(a) (3) and (1), by failing to assign overtime work to employee Litka, and by discharging employee Hughes because of their union activities.

Guild manufactures kitchen cabinets and juvenile furniture at St. Petersburg, Florida. Saad was its labor counsel. The organizational efforts of the union began in June 1960. Shortly thereafter Respondent's president charged his supervisory personnel with regard to the union activity, and immediately various employees were asked by foremen if they had signed union cards, told that the president would not recognize the union, and that he had threatened to close the plant rather than deal with the union. One foreman inquired as to whether an employee had signed a union card, or knew of any employee who had, and stated that those who had should ask for them back because the president would close the plant before any vote was taken. Employee Edwards, whose status as a supervisor was disputed, but who received the charge along with supervisory personnel from the president stated to another employee that the president would not "tolerate any union whatsoever" and that the company was "going to have a way of knowing who signed cards and eventually you will get laid off". The Trial Examiner attributed the conduct of this employee to the company on the basis that she was acting pursuant to the instruction of the president, and found it unnecessary to resolve the conflict as to her supervisory status.

In August 1960 the union filed unfair labor practice charges against Guild. These were settled on September 8 by an agreement whereunder Guild posted a notice at its plant that it would not interrogate its employees concerning union membership or solicit them to withdraw from the union, or threaten to close its plant if the union became the recognized bargaining representative of its employees. Guild posted the following additional notice, quoted in pertinent part, on the board at about the same time, and it was still posted at the time of the hearing:

"TO ALL EMPLOYEES

"We want you to know that the policy of this Company with regard to this Union is exactly what it has always been:

"WE ARE OPPOSED TO THE UNION AND WE INTEND BY EVERY LEGAL MEANS TO PREVENT IT FROM COMING INTO THIS PLANT.

"It is our sincere belief that if the Union were to get in here, this would not work to your benefit but to your serious harm. (Underlining in original.) * * * "

In December 1960 the Regional Director of the Board set aside the settlement agreement on the basis that it had been breached by subsequent unfair labor practices. This action was justified under the facts of this case and it was proper to consider evidence as to Respondent's conduct, both before and after the settlement agreement in determining the unfair practices case.[1] Wallace Corporation v. N. L. R. B., 1944, 323 U.S. 248, 65 S. Ct. 238, 89 L.Ed. 216.

One of the subsequent unfair practices occurring during the interim had to do with the denial of overtime work to Litka. The company president learned during the summer that he had signed a union card. In the first week of October he was told by his foreman that he could have no more overtime. He testified that he approached the president and asked him if he was being denied

---

1. Guild has formally admitted in its brief that it violated § 8(a) (1) prior to the settlement agreement.

overtime on account of the union, whereupon the president replied in the affirmative, and that if he would get his union card back and tear it up in front of him he could resume working overtime the next day. Of course, the president denied this but the Examiner credited Litka. The president did admit that he talked to Litka about overtime but contended that it was Litka who stated that he intended to get his union card back. On October 17 foreman Thomas, who, it turned out, was affiliated with the union, gave Litka some overtime work in his department. However, on the same day Litka's regular foreman told Litka that there was plenty of overtime in the shipping department but that the president had instructed him to give none to Litka. A charge alleging unlawful discrimination against Litka was filed against Guild on or about October 26, and the general foreman at about the same time informed Litka that he could work overtime. Litka's regular foreman testified that he stated to Litka in the latter part of October or the first part of November that there would soon be "some sort of an election in the factory for union representation and that if a union came in the overtime would be cut out".

Another unfair practice alleged to have occurred during this interim involved Respondent Saad as counsel for Guild. He interrogated at least twelve employees on November 25. His asserted purpose was to prove that foreman Thomas was in fact a supervisor and that his wife, an employee of the company, was working for the union, and to show that Thomas was helping the union, all in an effort to challenge the representation election, then pending. His theory was that the vote of a supervisor could not count, and therefore votes obtained as the fruit of his efforts and the efforts of his wife who, it was claimed, was his agent, could not be counted. The Litka unfair practice charge was then pending, and under the facts it was reasonable to assume that other charges would be forthcoming. Mr. Saad testified that while he was about it he asked some questions with regard to that phase of the situation. Most of these witnesses were sworn and testified before a court reporter, a practice we condemned in a similar context of anti-union animus in N. L. R. B. v. Lindsay Newspapers, Inc., 5 Cir., 1963, 315 F.2d 709, as being proscribed by § 8 (a) (1) because of being a method of interrogation tending to intimidate the employees. At any rate a charge was filed against Guild and Saad on December 16 because of this conduct.

Employee Hughes was discharged on December 14, 1960. She was interrogated on two occasions by her supervisor as to whether she had signed a union card. On the second occasion, early in October, she admitted signing such a card. Her foreman warned her to tell no one about it or about his questioning her, and declared that if the union came in privileges would be lost. Later in that month the foreman asked her if a union representative had called to see her the night before. In November she was asked by her foreman if she had tried to get her union card back, and replied in the negative. Another foreman called her into his office on December 14 and told her that she was being permanently laid off for lack of work. She remonstrated that there was plenty of work, and that she was being laid off because she had signed a union card. This foreman replied that he did not say that, and added that he was sorry and did not have anything to do with it. Upon seeking clarification as to whether the layoff was permanent or temporary, he then admitted that she was being fired rather than laid off. There was evidence to the contrary that business was poor because of the loss of a chief customer for bookcases in which department Hughes was employed, and five other employees were laid off a week later.

We think it clear from a mere recital of the facts, and without giving any weight to the alleged unlawful conduct of lawyer Saad that the record abundantly supports the order of the Board with respect to the § 8(a) (1) violation, and also

with respect to the § 8(a) (3) and (1) violations with respect to employees Litka and Hughes. Indeed, violation of § 8(a) (1) prior to the settlement agreement is admitted and this alone is sufficient. Wallace Corporation v. N. L. R. B., supra. The order will be enforced in all respects against Respondent Guild.

■■ We come next to the case of Respondent Saad. There is authority for including a company agent as a Respondent in an unfair labor practices complaint, and in the order issued thereon. Cf. N. L. R. B. v. Taylor-Colquitt Co., 4 Cir., 1943, 140 F.2d 92 (wife of a supervisory employee) and N. L. R. B. v. Sun Tent Luebbert Co., 9 Cir., 1945, 151 F.2d 483, cert. den., Merchants & Manufacturers Ass'n of Los Angeles v. N. L. R. B., 329 U.S. 714, 67 S.Ct. 44, 91 L.Ed. 620, (employer association). See also § 2(2) of the Act, 29 U.S.C.A. § 152(2). However, we are unaware of any case where a lawyer has been held as a Respondent, as distinguished from holding the company through the conduct of the lawyer as its agent. This is not to say that in a proper case a lawyer could not to be held, but it must appear that the lawyer was purposely aiding the employer in contravening the statute, rather than restricting his activity to matters within the scope of and relevant to rights of the employer by way of proceedings pending or imminent. Here the conduct of Mr. Saad in examining the twelve employees in November with respect to the status of foreman Thomas does not show such aid. Moreover, it was within the scope of and relevant to the pending election and unfair labor practice charge. He had been advised by his client that foreman Thomas had signed a union card and was actively engaged in union activity. That Thomas was so engaged was in fact true. He hoped to attack the representation election, then pending, because of supervisor participation. He was also justified in proper interrogation by reason of preparing a defense to the unfair practice charge filed on October 26.

A careful review of the questions propounded demonstrates that all were relevant to one or the other of these bases for the questioning, although some were coercive in result and may have tended to interfere with the rights of the employees under the Act. For example, the inquiry directed to most as to whether they had heard the rumors that the president might close the plant rather than accept a union, or that anyone who signed a union card would be fired could have been interpreted as veiled threats. Also the employees were asked questions regarding Thomas which shed light on their own union activity such as whether they had seen Thomas at a union meeting, or whether Thomas or any supervisor had induced the witness to get his or her union card. Counsel could have been more selective in his questions so as to afford his client its rights while at the same time preserving those of the employees, but there was no evidence of purposeful intimidation or coercion. Only one small department was involved, that of foreman Thomas, and the two-edged questions asked clearly related, on one edge, to the legitimate purpose being undertaken.

The right to counsel before an administrative agency such as the Labor Board, no less than before courts, is a precious right and one to be preserved and given effect. To charge counsel as here, and put him on trial as a Respondent along with the employer is tantamount to a restraint, intimidatory and coercive in nature. There is no substantial evidence to warrant holding Mr. Saad as a Respondent by reason of violating § 8(a) (1). Such inference as might have been drawn from the subject matter of the interrogation did not rise to the level of a fairly conflicting view that we should sustain. Universal Camera Corporation v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; and N. L. R. B. v. Walton Mfg. Co., 1962, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829.

In Joy Silk Mills v. N. L. R. B., 1950, 87 U.S.App.D.C. 360, 185 F.2d 732 the

court, with reference to interrogation of employees by their employer stated the rule, in our opinion a sound one, as follows:

"The Board has held that 'an employer is privileged to interview employees for the purpose of discovering facts within the limits of the issues raised by a complaint, where the employer, or its counsel, does so for the purpose of preparing its case for trial and does not go beyond the necessities of such preparation to pry into matters of union membership, to discuss the nature or extent of union activity, to dissuade employees from joining or remaining members of a union, or otherwise to interfere with the statutory right to self-organization.' In the Matter of May Department Stores Co., 70 N.L.R.B., 94, 95.

"Apparently this rule means that an employer may question his employees in preparation for a hearing but is restricted to questions relevant to the charges of unfair labor practice and of sufficient probative value to justify the risk of intimidation which interrogation as to union matters necessarily entails; and that even such questions may not be asked where there is purposeful intimidation of employees. Such a standard assumes that interrogation of employees concerning their union activities is, of itself, coercive, but that fairness to the employer requires that a limited amount of such questioning be permitted despite the possible restraint which may result.

"We think that the standard established by the Board, as just described, is a reasonable one, and aptly designed to carry out the purpose of the Act. * * * "

Thus it is a matter of drawing a balance between the separable rights of the employer and the employees, delicate in all events, and one that requires the utmost in care and good faith on the part of company counsel.

█ The use of a court reporter and the taking of sworn testimony, as stated, is condemned under the facts of this case on the holding of Lindsay, supra, and buttresses the 8(a) (1) finding against Guild. Our holding in Lindsay came long after this interrogation, and was not a basis for either charging or holding Saad. For that reason, and because it was a question of first impression, we will not apply it to hold Saad here.

█ The conduct of other lawyers in an interrogation which took place in January 1960 was also found to violate § 8 (a) (1).[2] This was a massive proceeding by a team of lawyers, taking place over a period of five days in which every employee of Guild was questioned. Thirty former employees were also questioned. Our determination as it relates to this conduct must be made within the bounds of the rule stated in Joy Silk Mills, Inc., supra. Relevant to this determination is whether or not the questioning fell within the scope of the issues then pending, and was designed to produce probative evidence. Another matter to be considered is the procedure used. Did it exceed what was necessary to afford the employer the right to prepare a defense?

The supervisors were first interviewed by the lawyers with respect to the charges but with little success. After the interrogation complained of, the lawyers were able to again interview the supervisors with the result that the supervisors recalled certain instances of alleged unlawful activity, and this resulted in a stipulation with General Counsel on some of the facts pertaining to the consolidated complaint. No supervisory employees were present during the questioning. The employees were advised that they were being questioned on behalf of the company in connection with the pending unfair labor practice charges, and that the truth was sought whether or not it was prejudicial to the company.

---

2. Respondent Saad, of another firm, was not a participant.

They were told that the purpose of the questioning was not to inquire about their union activity. Participation was on a voluntary basis and a number of employees refused to be questioned. The examination took place at the plant during working hours. The employees were first orally examined without being sworn, and then after being sworn by a notary public were asked to fill out a six page questionnaire containing nearly one hundred questions. These same questions were the subject matter of the oral examination.

As distinguished from Lindsay, supra, and the Saad interrogation, here no court reporter was used, but without deciding whether the taking of a sworn statement or questionnaire alone constitutes a violation of the Act, there are other circumstances to be considered. The Examiner placed prime reliance on the fact of the notice, standing as a silent sentinel, on the bulletin board that the company intended "by every legal means to prevent the union from coming into the plant". He also felt that some of the questions exceeded the scope of the pending issues. The line between proper preparation of a defense in a proceeding of this type and conduct prohibited by the Act is fine indeed. In the main, much of what transpired in this interrogation was privileged on the basis of proper preparation but in sum, because of the posted company notice, the fact of the unsworn oral examination and the sworn questionnaire on the same questions, coupled with the anti-union animus present, it went beyond the pale of privilege. The Board was justified in holding it violative of § 8(a) (1) of the Act in that it constituted conduct tending to discourage union membership and activity.[3] The employees might well have thought that this was one of the legal means which the company had promised to use. Although not necessary, this finding too buttressed the order of the Board as it related to the 8(a) (1) violation.

The order was proper and will be enforced in all respects save as to Respondent Saad. It must be modified to eliminate him as a Respondent. As modified it should be and is enforced.

---

3. The Board has promulgated rules governing the conduct of lawyers as such. Rules and Regulations, Series 8, §§ 102.- 66(d) and 102.72. There appear to be no rules having to do with discovery but see § 102.35 providing for depositions.