**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GARY AIRCRAFT CORPORATION, Respondent.**

**No. 22950.**

United States Court of Appeals
Fifth Circuit.

Nov. 8, 1966.

Rehearing Denied Jan. 4, 1967.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Robert A. Giannasi, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Glen M. Bendixsen, Atty., N.L.R.B., Washington, D. C., for petitioner.

L. G. Clinton, Jr., Houston, Tex., Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., of counsel, for respondent.

Before JONES and DYER, Circuit Judges, and SPEARS, District Judge.

DYER, Circuit Judge:

Having considered, decided and written so much in prior Board enforcement proceedings, we find nothing new or different in this case that takes it out of the ambit of settled jurisprudence. No detailed discussion of the evidence is therefore necessary.

The Board approved the findings and conclusions of the Trial Examiner that Beerwart had been selected for discharge because of his union activities, and therefore the company interfered with, restrained and coerced its employees in violation of Section 8(a) (1), and dismissed employee Freier because of union activity, which is proscribed by Section 8(a) (3) and (1).

Respondent urges that the findings as to both Beerwart and Freier were based upon hearsay testimony of leadmen, and that Freier was discharged along with others because of an economic reduction in force.

The Company's Tank Sealing Department, having approximately sixty day shift employees, was under the general supervision of Foreman McCool. The department was divided into six crews of varying numbers, each headed by a leadman. There was no one in the supervisory hierarchy between McCool and the leadmen. McCool spent about eighty percent of his time in the office. Each day he outlined the work schedule gen-

erally to the leadmen, who then assigned particular work to the employees in the crews. It was the responsibility of the leadmen to direct the work and see that it was accomplished, and when a job was completed the leadmen directed the employees as to the work next to be undertaken, for there was no one else to do so. Thus the authority that the leadmen exercised clearly required the use of independent judgment. The leadmen were also responsible for keeping work sheets showing the amount of time spent on a particular job and the "squawk" book listing work discrepancies found by the inspection department. In correcting mistakes and demonstrating the proper way to do a job, checking work, and helping out when necessary, the leadmen performed varying amounts of manual labor. Additionally, the leadmen made effective recommendations to the foreman for raises for employees in their crews, and, although the foreman had the ultimate authority to hire, fire and transfer employees, the recommendations of the leadmen concerning transfer and discharge of employees played a determinative role. There was therefore substantial evidence on the record as a whole that the leadmen were supervisors within the meaning of the Act.[1] N. L. R. B. v. Charley Toppino and Sons, Inc., 5 Cir. 1964, 332 F.2d 85; N. L. R. B. v. Big Three Welding Equipment Company, 5 Cir. 1966, 359 F.2d 77.

The credited testimony showed without contradiction that the voice of management through the leadmen indicated that Beerwart was to be fired because he was a union agitator. There was thus a clear showing of discriminatory intent which had a coercive impact. N. L. R. B. v. Ferguson, 5 Cir. 1958, 257 F.2d 88.

Freier, who had been with the company since September, 1963, joined lead-man Coleman's crew on March 2, 1964, having been selected by the latter because he "could work circles around" his former leadman. When an economic reduction in force took place on March 9, 1964, four men were laid off in Coleman's crew, but Freier's name was not then discussed between Coleman and the foreman. That night Freier attended a union meeting and was signed as an inplant organizer, which was made known to the company the next day by a telegram from the union. On March 13, 1964, Freier was terminated, his slip stating that his work was not up to the company standard for the period of time employed. Leadman Coleman explained that he chose Freier for discharge rather than others, because Freier's attitude was poor and his seniority was less than that of the other crew members, in spite of the fact that he was selected by Coleman only eleven days before and was not considered for discharge in the reduction of force on March 9, 1964, when twenty-two employees in the tank department, four of whom were in Coleman's crew, were discharged.

The Company's explanations were properly rejected by the Board, because they were not so overwhelming as to make the contrary evidence unacceptable as a matter of law. N. L. R. B. v. Jackson Tile Manufacturing Company, 5 Cir. 1960, 282 F.2d 90.

We are convinced that substantial evidence on the record as a whole supports the Board's findings that the company interfered with, restrained and coerced its employees in violation of Section 8(a)(1) of the Act, and discharged employee Freier because of his union activity in violation of Section 8(a) (3) and (1). Accordingly, the Board's order is

Enforced.

---

1. The use of the word "leadman" as a title or job description is, of course, not the controlling determination of whether one is in a supervisory capacity under the Act. What counts is whether or not one has the power to act in accordance with the criteria set out in Section 2(11). Thus the cases of Poultry Enterprises, Inc. v. N.L.R.B., 5 Cir. 1954, 216 F.2d 798 and N.L.R.B. v. Griggs Equip., Inc., 5 Cir. 1962, 307 F.2d 275 are readily distinguishable.