**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BUDDY SCHOELLKOPF PRODUCTS, INC., Respondent.**

No. 25943.

United States Court of Appeals
Fifth Circuit.

April 23, 1969.

Rehearing and Rehearing En Banc
Denied June 20, 1969.

84

Marcel Mallet-Prevost, Asst. Gen. Counsel, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Ronald Wm. Egnor, Gary Green, Attys., N. L. R. B., Washington, D. C., for petitioner.

Fritz Lyne, Erich F. Klein, Jr., Lyne, Klein & French, Dallas, Tex., for respondent.

Before JOHN R. BROWN, Chief Judge, COLEMAN, Circuit Judge, and SCOTT, District Judge.

COLEMAN, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its order issued against Buddy Schoellkopf Products, Inc., a Texas corporation, in which the respondent was found guilty of various unfair labor practices. Specifically, the Board found that the company violated § 8(a) (3) and (1) of the Act by discharging two of its employees, Gertrude Bradshaw and Robert Maldonado, and by withholding overtime pay from Melvin Jaynes. It further found the company in violation of § 8(a) (1) by coercively interrogating and threatening its employees, in circulating a questionnaire among its employees, and in withholding from the employees the previously existing privilege of purchasing goods from the company.

The Board ordered the respondent to cease and desist from these unfair labor practices and, affirmatively, to reinstate Bradshaw and Maldonado, to make Jaynes whole for any loss he may have suffered, and to restore the privilege of purchasing company products.

The events in question took place during and after an organization campaign by the Amalgamated Clothing Workers of America, AFL–CIO in the fall of 1965.

1. The Discharge of Bradshaw and Maldonado.

The sole unfair labor practice charged against the respondent at its Mineola, Texas plant relates to the discharge of Gertrude Bradshaw, a sewing machine operator at the respondent's plant and an active and open supporter of the union.

As Bradshaw began work on October 28, 1965, Frances Dobbs, a supervisor, approached her and told her that she wanted Bradshaw and the other women who were campaigning for the union to stay at their machines and sew during working hours. Bradshaw denied leaving her machine during work and asked Dobbs why she did not tell the non-union women to stay at their machines. Dobbs replied that she intended to tell them, and as she started to leave, said to Bradshaw, "But I don't have to take any smart talk from you as yet". Bradshaw in turn said, "Well, I don't think I have to you, either".

After Dobbs reported this incident to Superintendent Hosea, Bradshaw was summoned into his office. Hosea told Bradshaw that Dobbs had reported her for saying that she did not have to take orders from her supervisor. Bradshaw denied that the conversation took place in that manner but she was nevertheless discharged by Hosea for insubordination. At the hearing before the trial examiner, Hosea admitted that he had decided to discharge Bradshaw before she was called into his office:

A week after Bradshaw's discharge, the company posted a set of work rules stating that employees could be discharged for insubordination.

The Board found that Bradshaw was discharged because of her union activity and not for insubordination, as the company claimed.

■ The discharge of an employee is ordinarily a matter within management's prerogative and, consequently, an unlawful discharge is not lightly to be inferred, N. L. R. B. v. McGahey, 5 Cir. 1956, 233 F.2d 406. We find, however, that there was substantial evidence on the record as a whole to support the Board's conclusion as to this employee. As we said in Great Atlantic & Pacific Tea Co. v. N. L. R. B., 5 Cir. 1966, 354 F.2d 707, 709:

"[T]he Board is not compelled to accept the employer's statement when there is reasonable cause for believing that the ground put forward by the employer was not the true one, and that the real reason was the employer's dissatisfaction with the employee's union activity. N. L. R. B. v. Texas Bolt Co., 5 Cir. [1963], 313 F.2d 761. When faced with a review of findings, pegged on witness credibility, courts have generally held that a determination of credibility by the N.L.R.B. is not to be reversed unless there is uncontrovertible evidence to the contrary. N. L. R. B. v. Dixie Gas Co., 5 Cir. 1963, 323 F.2d 433; N. L. R. B. v. Camco, Inc., 5 Cir. 1965, 340 F.2d 803."

The fact that Bradshaw was not given an opportunity to explain her version of what took place between herself and Dobbs, coupled with Hosea's admission that he had determined to fire her even before he talked with her, plus the posting of the work rules so near to the time of her discharge, adequately support the Board's finding that the discharge was unlawful.

Robert Maldonado was first hired by the respondent at its Dallas plant in September, 1964, and was adjudged to be a satisfactory worker up until the time of the termination of his employment.

In June, 1965, Maldonado told his immediate supervisor (Leigh) and another supervisor (Hudson) of his plans to take a civil service examination with the hope of securing employment with the Post Office Department. Hudson asked only that the company be given two weeks notice so he could train a replacement and said that Maldonado could continue to work at the Dallas plant until called by the Post Office. Leigh expressed his delight in seeing a young man get ahead.

The union organizational campaign followed. Maldonado became a union supporter in August, after a union representative visited his home. He signed an authorization card, attended two or three union meetings, and secured authorization card signatures from two fellow employees. In addition, Maldonado's name appeared as a member of the union organizing committee on a telegram sent

by the union to the company on October 27.

On November 15, Maldonado notified Leigh that the civil service examination would be given the next week, and also that he did not know if he would pass, so he was not at that time giving notice of his resignation. When asked by Hudson if he was quitting, Maldonado said he was not. That same day, he was called into Leigh's office and informed that since there was no reason to believe he would not pass the examination, his resignation would be accepted as of November 19. Upon Maldonado reiterating that he was not quitting, Hudson replied, "When you look for a better job, you know you no longer want to work for us". The entire conversation in Leigh's office was preserved by a company tape recorder.

Maldonado picked up his last check at the plant November 19, but was not given vacation pay because of the company's position that he was quitting. He returned to work the following Monday but upon being told that he had quit, was refused admission to the plant.

The Board found that the respondent's sudden shift in its attitude toward Maldonado and its ultimate discharge of him was a result of his union activity and therefore unlawful.

There can be little doubt from this evidence that the termination of Maldonado's employment was initiated by the company and not voluntary. That leaves us the question of whether the discharge was prompted by his union activity.

The thrust of the company's defense is its assertion that Supervisor Hudson knew nothing of Maldonado's union activity and therefore this could not have possibly motivated his discharge. The company concedes Maldonado was a satisfactory worker, but maintains that since he was planning to quit anyway, it was preferable for Hudson to proceed to train his replacement.

The decisive consideration here is that by virtue of the telegram of October 27 the company knew of the union activity of this particular individual. It condoned the discharge, and, in effect, ratified it. It therefore cannot successfully shield itself behind the ignorance of its own supervisor.

We are not unmindful of N. L. R. B. v. Fountainebleau Hotel Corp., 5 Cir. 1962, 300 F.2d 662, in which we noted that the Board, under similar circumstances, ignored lack of knowledge by the supervisor who ordered the discharge in question. The point in *Fountainebleau* was that no one in the employ of the company in any supervisory or managerial capacity was aware of the activity.

We therefore hold that there was substantial evidence to support the Board's finding that the company claim of dismissing Maldonado so it could train a replacement was pretextual only and that he was in fact discharged because of his active union participation. See N. L. R. B. v. Mira-Pak, Inc., 5 Cir. 1965, 354 F.2d 525; N. L. R. B. v. Coats & Clarke, Inc., 5 Cir. 1956, 231 F.2d 567.

2. Withholding Overtime Pay from Melvin Jaynes.

Jaynes was hired at respondent's Dallas plant in December, 1959, and continued to work there until he resigned in April, 1966. Along with other employees, he became interested in the union's campaign in the fall of 1965. He signed an authorization card and engaged in certain union activities. On October 13, he was called into Vice President Chandler's office and told that since he was not considered a foreman, he could continue his union activities.

Until that time, Jaynes had proved to be a satisfactory worker, was reprimanded only occasionally, and was awarded overtime assignments at various intervals. However, after the visit to Chandler's office, he received four harsh written reprimands within six months, allegedly for poor work, and was assigned overtime work only once in six months. From April 1 until he quit in mid April, he worked eight and one-half hours of overtime. In one instance, he overheard

Supervisor Hudson tell Supervisor Leigh that everyone but Jaynes was to be assigned overtime work.

▇▇ The Board found that the respondent discriminated against Jaynes by refusing him overtime assignments, thereby violating § 8(a) (3). We agree. This Court has previously held that the denial of overtime work is an unfair labor practice if motivated by the employee's support of the union. N. L. R. B. v. Guild Industries Mfg. Corp., 5 Cir. 1963, 321 F.2d 108. The respondent's abrupt change in its treatment of Jaynes after learning of his pro-union stance and its resulting failure to account for the disparate treatment accorded him plainly justified the Board conclusion.

### 3. Coercion of Respondent's Employees.

The Board charged the respondent, through the acts of three supervisors, Joe Henson, James Winterow, and Delbert Chandler, with coercively interrogating its employees.

▇ Respondent first contends that Joe Henson was not a supervisor and therefore his acts could not be charged to it. The evidences showed that Henson was in charge of the receiving department at the Dallas plant, received all raw materials which came to the plant, personally kept records of receipt and distribution of the materials, directed the work of two employees, and reported directly to the company's secretary-treasurer. He did engage physically in the work. It also appeared that Henson regarded himself as a supervisor.

We believe there were sufficient facts for the Board to conclude that Henson was a supervisor. The tasks he performed do not vary significantly from those of persons whom we held to be supervisors in N. L. R. B. v. Gary Aircraft Co., 5 Cir. 1966, 368 F.2d 223, cert. den. 387 U.S. 918, 87 S.Ct. 2032, 18 L.Ed.2d 971 (1966).

▇ As is often the case, the evidence regarding the alleged unlawful interrogations by Henson, Winterow and Chandler was conflicting. While each claimed only to have asked employees innocuous questions, witnesses for the Board testified that the supervisors made open threats to employees, withheld material from one employee because she was a union adherent, questioned employees about their attitude toward the union, and made derogatory remarks about the union. It was for the trial examiner and the Board, and not the Court, to judge the credibility of the witnesses and to make the findings. We cannot say that their conclusion that the interrogations interfered with, restrained, or coerced the respondent's employees was not supported by substantial evidence on the record as a whole. See N. L. R. B. v. Camco, Inc., 5 Cir., 1965, 340 F.2d 803; Great Atlantic & Pacific Tea Co. v. N. L. R. B., supra.

The next alleged coercion involves a speech made by respondent's president, Buddy Schoellkopf, to employees shortly before the election. In the course of his speech, Schoellkopf made the following remarks which the board found to be coercive:

"Well, now, you just stop and look around as far as unionism in garment plants and plants in this area is concerned, it is not predominant. It is so far in the minority it isn't even funny. Only the work clothes people in this area are the union people.

Now, you are going to be marked if this union gets in. You are going to be marked and everyone will know it. When you leave here for any reason, your husband moves, or something like that, or you get fired, or whatever the circumstance is, and you are applying for another job, they'll say, 'Where did you come from?' And you will answer, 'Buddy Schoellkopf Products', and they'll say, 'That's nice. What did you do?' and you'll say, 'I worked on a zig-zag machine'. 'Well, that's nice. We'll call you if we need to.' Think about that, too. Don't worry, they are going to know who's who. And you can't discriminate, by law. You legally cannot refuse to hire somebody just because

they're associated or affiliated with a union."

█ It is true that the employer did have a right to voice his opposition to the union, N. L. R. B. v. McGahey, supra, and in this speech did mention that discrimination was illegal. But we think that this speech, viewed in its entirety and especially in the context of the respondent's strong anti-union attitude and the many unfair labor practices of which it was found guilty, could reasonably be viewed by the employees as a not-so-veiled threat that if they joined the union the company would see to it that they could not secure employment elsewhere in the future. As such, it was a speech which was not protected under § 8(c) of the Act.

We now reach a more serious question involving a questionnaire distributed to respondent's employees by its attorney May 13, 1966, to aid in the preparation of its defense to the unfair labor practice charges. The Board found that portions of the questionnaire, wherein the employees were asked the identity of those who solicited authorization cards, the identity of those persons who collected the cards and in whose presence the cards were signed, were irrelevant to the respondent's defense and therefore improper. It further found that certain questions dealt with the employees' subjective state of mind and thus violated the Act.

█ Before reaching the merits, a procedural problem will first be resolved. The first charge against the respondent was filed January 21, 1966, and the complaint issued February 2. Thereafter, the complaint was amended several times. Then, on August 18, the date set for the hearing before the trial examiner, the Board moved to amend the complaint to add the allegation concerning the questionnaire. The respondent immediately objected to the amendment, arguing that it was not given a sufficient opportunity to prepare a defense to the new allegation. The trial examiner overruled both the objection and the respondent's motion for a continuance. The matter proceeded to hearing, and before presenting its evidence, the respondent again objected to the admission of evidence concerning the questionnaire.

The respondent, pointing to our opinion in Russell-Newman Mfg. Co. v. N. L. R. B., 5 Cir. 1966, 370 F.2d 980, now contends that the trial examiner's failure to give it sufficient opportunity to prepare a defense to the new charge was a denial of due process. We do not agree. The situation in *Russell-Newman* was different. There the company had no real opportunity at the original hearing to offer evidence to refute the Board's claim that it had committed an unfair labor practice. It was allowed only to make an offer of proof which the Board found insufficient on its face. Here, however, respondent did in fact present evidence in defense of the General Counsel's charge that the questionnaire was improper. There was no dispute as to either the content or the circulation of the questionnaires. Respondent could not have been injured by the trial examiner's ruling. Consequently, there was not denial of due process.

█ With regard to the questionnaire itself, it is well settled that an employer is privileged to question employees about matters alleged in the General Counsel's complaint, Joy Silk Mills v. N. L. R. B., 87 U.S.App.D.C. 360, 185 F.2d 732, 1950, but it is likewise true that he must limit his inquiries to such matters, Texas Industries Inc. v. N. L. R. B., 5 Cir. 1964, 336 F.2d 128, and may not delve into inquiries about union membership and activities, Joy Silk Mills v. N. L. R. B., supra. In this case the respondent went far beyond the legally imposed bounds by asking employees about their attitude toward the union and seeking the identity of those who solicited and collected authorization cards. Furthermore, it failed to tell the employees that they were not obligated to answer the questionnaire. The Board therefore correctly found the questionnaire to be improper.

█ The final point involves the respondent's practice of permitting employees at the Dallas plant to purchase its products at a significant savings under the retail price. While this privilege was enjoyed prior to October 1965, it was abruptly halted when the union waged its active campaign. When asked when the

privilege would be renewed, respondent's president replied that it could not be reinstated as long as the "union business" continued. No further explanation was given. But it requires little imagination to comprehend that this had both the purpose and effect of discouraging union activity. Accordingly, the Board did not err in finding that it violated § 8(a) (1).

The order of the Board is in all respects

Enforced.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.