W. Willard **WIRTZ**, Secretary of Labor
of the United States, Appellant,

v.

Cody **FOWLER** et al., Appellees.

No. 22350.

United States Court of Appeals
Fifth Circuit.

Oct. 19, 1966.

Robert C. McDiarmid, Alan S. Rosenthal, Attys., Dept. of Justice, Washington, D. C., for appellant.

P. D. Thomson, D. P. S. Paul, Miami, Fla., for appellees.

Before PHILLIPS,* JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This appeal from a summary declaratory judgment, S.D.Fla., 1964, 236 F. Supp. 22, 40 N.Y.U.L.Rev. 366 (1965), holding that Appellees, partners engaged in the practice of law, have no duty under §§ 203(b), (c), (f), 204 of the Labor-Management Reporting and Disclosure Act of 1959 [LMRDA], 29 U.S.C.A. §§ 433(b), (c), (f), 434 (1958) ed. Supp. V) [1] to file any report covering any of their activities during 1960 and 1961 on behalf of their Employer clients, presents a question of first impression as to the construction of these statutory provisions, the impact of the common-law at-

---

* Of the Tenth Circuit, sitting by designation.

1. The pertinent portions of § 203 are as follows:

"(b) Every person who pursuant to any agreement or arrangement with an employer undertakes activities where an object thereof is, directly or indirectly—

(1) to persuade employees to exercise or not to exercise, or persuade employees as to the manner of exercising, the right to organize and bargain collectively through representatives of their own choosing; or

(2) to supply an employer with information concerning the activities of employees or a labor organization in connection with a labor dispute involving such employer, except information for use solely in conjunction with an administrative or arbitral proceeding or a criminal or civil judicial proceeding;

shall file within thirty days after entering into such agreement or arrangement a report with the Secretary, signed by its president and treasurer or corresponding principal officers, containing the name under which such person is engaged in doing business and the address of its principal office, and a detailed statement of the terms and conditions of such agreement or arrangement. Every such person shall file annually, with respect to each fiscal year during which payments were made as a result of such an agreement or arrangement, a report with the Secretary, signed by its president and treasurer or corresponding principal officers, containing a statement (A) of its receipts of any kind from employers on account of labor relations advice or services, designating the sources thereof, and (B) of its disbursements of any kind, in connection with such services and the purposes thereof. In each such case such information shall be set forth in such categories as the Secretary may prescribe.

(c) Nothing in this section shall be construed to require any employer or other person to file a report covering the services of such person by reason of his giving or agreeing to give advice to such employer or representing or agreeing to represent such employer before any court, administrative agency, or tribunal of arbitration or engaging or agreeing to engage in collective bargaining on behalf of such employer with respect to wages, hours, or other terms or conditions of employment or the negotiation of an agreement or any question arising thereunder.

\* \* \* \* \*

(f) Nothing contained in this section shall be construed as an amendment to, or modification of the rights protected by [§ 8(c) of the National Labor Relations Act]."

Section 204 provides:

"Nothing contained in this chapter shall be construed to require an attorney who is a member in good standing of the bar of any State, to include in any report required to be filed pursuant to the provisions of this chapter any information which was lawfully communicated to such an attorney by any of his clients in the course of a legitimate attorney-client relationship."

torney-client confidential communication privilege on such construction, and the constitutionality of the provisions as construed. We reverse in part, affirm in part, and remand. In short, we hold that the evidence—viewed, as it must be on summary judgment, most favorably to the Government—clearly shows that Appellees have engaged in "persuader" activities[2] on behalf of four employer-clients which must be reported under the 30-day and annual reporting requirements of § 203(b) and which are not exempt from these requirements by virtue of §§ 203(c), (f), or 204. However, contrary to the position taken by the Government, we conclude that the statute does not require Appellees to include in their annual reports a statement of receipts from and disbursements on behalf of other clients for whom they performed only nonpersuader labor relations activities in regard to which no 30-day report is required. As so construed and applied, the reporting requirements of § 203(b) are constitutional.

## I

This suit was initiated by the Appellees in the District Court for a declaratory judgment that they were not subject in any manner to the reporting requirements of § 203(b) of the LMRDA. The Government counterclaimed seeking an injunction requiring Appellees to comply with the Act.

The Government contended that pursuant to arrangements with four of their clients,[3] Appellees had engaged in persuader activities and that within 30 days of each such arrangement they were required to report the terms and conditions thereof. Furthermore, the Government contended that under § 203(b) the Appellees were required to file annual reports as to each fiscal year within which payments were received pursuant to those agreements, and that these reports had to include a statement of receipts from, and disbursements on behalf of, all clients to whom Appellees had rendered any kind of labor relations services or advice, including but not limited to the four clients for whom Appellees had performed persuader activities. According to the Government, attorneys *qua* attorneys are not exempt from the reporting requirements and must file a 30-day report as to each persuader agreement. An attorney who confines his activities to those enumerated in § 203(c) need not file any report, but once he undertakes on behalf of any client persuader activities not within the scope of § 203(c), he must not only file a 30-day report covering these activities, but must file an annual report covering even those activities described in § 203(c). And he must do so as to all clients. The Government's construction of the Act is that the § 203 (c) exemption applies solely to "who" must report rather than to "what" must be reported. If an attorney engages in persuader activities which are not exempt by § 203(c), this triggers the necessity for him to report all his labor relations activities on behalf of all his clients. Finally, the Government contended that neither § 203(f) nor § 204 exempt the Appellees from the reporting requirements of the Act. Section 204, in contrast, to § 203(c), limits "what" must be reported, not "who" must report, for it comes into play only once a report is required to be filed. And even then, it only exempts the attorney from reporting confidential communications within the traditional scope of the attorney-client privilege. According to the Government, the information required by his official report forms would not trespass on this privilege. As to § 203(f), there is simply no modification of the employer's rights under § 8(c) of the LMRA by requiring his attorney to report on labor relations activities.

2. By "persuader activities" we mean all those activities an object of which is either to persuade employees within the meaning of § 203(b) (1) or to supply an employer with information within the meaning of § 203(b) (2).

3. L. D. Plante, Inc.; Plant City Steel Corp.; Speed Sprayer Plant, John Bean Division, Food Mach. & Chem. Corp.; Guild Indus. Mfg. Corp.

The Appellees, on the other hand, did not deny that their activities on behalf of the named clients were those of a "persuader" or within the literal terms of § 203(b). Instead, they vigorously insisted that their activities were confined to those listed in § 203(c) because they were all things which a lawyer professionally and ethically might properly do in connection with, and in furtherance of, representation of their clients in administrative, judicial or collective bargaining proceedings. Furthermore, since these activities constituted a well-recognized part of the practice of labor law, they were exempted by virtue of § 204. And finally, Appellees attacked the Government's construction of the Act as unconstitutionally abridging their clients free-speech rights and their attorney-client privilege, the latter especially if they were required to report all nonpersuader activities on behalf of clients who hired them to do no persuader acts.

With the lines of contention thus clearly drawn, the Government, over many obstacles, sought by pretrial discovery to factually establish the types of activities it alleged Appellees undertook on behalf of their four named clients. Introduced into evidence by the Government were many, many pages of depositions, requests for admissions and their answers, interrogatories and their answers, stipulations, etc. Appellees, however, apparently content to rely on their position that, regardless of the precise nature of their activities, they were not, as a matter of law, subject to the reporting requirements of the Act, introduced little, if any, evidence to contradict the factual assertions of the Government or the evidence introduced in support of those assertions. Insisting then, as they now do, that the depositions presented by the Government are irrelevant, the deposition proceedings were often a frustrating experience in the effort of discovery. Time and time again, at the taking of the depositions, the Appellees objected to the Government's questions as violative of the attorney-client privilege, as irrelevant and immaterial, as leading, as calling for a conclusion of the witness. Question after question, they repeated the same objection. All in all, the lawyers did more talking than the deponents. If, as Appellees now assert, the deponents' testimony was confused, unsure, and vague, the Appellees are certainly partly responsible for this state of things, for the deponents could scarcely get a word in edgewise. The Government's requests for admissions, motions for production of documents, and motion to compel one of Appellees' partners to answer on deposition met with the same kind of stubborn resistance. And many of Appellees' objections to these requests were sustained by the Court on the ground that the requests were irrelevant and immaterial—a result, we may add, which was consistent with the Court's concept of controlling substantive principles which we hold to have been erroneous. Although the Government now complains of these rulings, many of which we agree are of doubtful propriety, our view of this appeal makes decision thereon unnecessary.

Neither need we pass on the Government's more serious complaint that the trial Court ruled on Appellees' motion for summary judgment without allowing it to complete its discovery and without ever definitively ruling on a number of its motions for discovery. For in any case, before completing discovery, the Government likewise moved for summary judgment stating the belief that it was so entitled on the basis of the evidence of record, even without the further discovery sought. The Government was at least half right. Construing the evidence most favorably to the Government,[4] we conclude that the trial Court erred in granting summary judgment to Appellees as to their duty to report persuader activities. It does not follow, however, that the Court erred in not granting the Government's motion. As to it, much may well turn out on remand

4. 3 Barron & Holtzoff, Federal Practice & Procedure § 1235, at 138–40 (1958 Wright rev.).

to be established as a matter of law under the principles we announce. But it is better administration that the trial Court examine it in the light of such principles and then determine just what is so established and what remains for resolution by the trier of fact.

## II.

In granting Appellees' motion for summary judgment, the District Court purported to accept the Government's version of Appellees' activities, 236 F.Supp. at 25, and to resolve all factual disputes in favor of the Government, 236 F.Supp. at 28. However, the District Court summarized these facts in such a general way that it is impossible to tell whether this was really so. The Court below summarized them in such a general fashion as to mask the real nature of Appellees' persuader activities. Because these facts vividly portray these activities and are so essential to the applicability of the Act, we deem it appropriate to describe in some detail Appellees' activities on behalf of the four named clients.

### L. D. Plante, Inc.

In 1960, Appellees represented L. D. Plante, Inc., and Paul Saad, an attorney associate in the firm and an agent of Appellees, performed certain services for that company. During a labor dispute arising out of a unionization drive [5] Paul Saad, on at least two occasions, spoke to groups of employees during working hours. At one meeting, held in Mr. Plante's office, Saad, introduced as Plante's attorney, discussed the union that the employees were trying to form. Saad advised the four employees present that, under certain conditions, the Company would have the right to fire any employees who went on strike and that he would recommend that it do so. Saad also told the employees that, if they interfered with the railroad serving the Company, they could be put in the federal penitentiary. He also pointed out the benefits the Company was giving. At a second meeting, many of the plant employees were assembled to hear Mr. Saad. Saad discussed what the union would mean to those who joined it and what the employees would stand to gain and what they would stand to lose.[6] He raised the issue of strikes and what they would mean to the employees, and when the Company could replace employees on strike.[7]

### Plant City Steel Corp.

In 1956 a local of the Boilermakers filed a petition for an election at Plant City. The election was held in July 1957, and won by the Boilermakers. Thereafter, in November 1957, Appellees, attorneys for Plant City, notified the Boilermakers that it was intending to

---

5. In February, the United Packinghouse Workers filed a petition for a representation election, and on March 7, 1960, a Notice of Representation Hearing was issued. On March 30, the union filed an unfair labor practice charge against L. D. Plante Inc.

6. These sworn answers to Appellee's interrogatories for summary judgment purposes raised fact questions as to Saad having made these remarks:
 (a) If the union succeeded the employees would lose the benefits they had already gained.
 (b) If the Company had to bargain with a union everything would "start from scratch."
 (c) He reminded the employees of the benefits they were then receiving.

7. The employee-deponents who heard Saad were unanimously of the opinion that he was trying to persuade them from joining the Union. One said that "we were being politely asked to vote against the Union" and that "they were trying to dissuade us from using Union membership." Another felt that Saad "was trying his best to make everybody think that they had better benefits right then than they would have had if we went union." Appellees themselves admit that Saad's "talks to said emloyees were designed and intended to influence and persuade said employees against voting in favor of" the Union.

Following the activities of Saad, a second unfair labor practice charge was filed against Saad and Plante. These charges were never tried but were disposed of by a posting order under a consent agreement which expressly disclaimed any admission that the acts were done or constituted an unfair labor practice.

test the NLRB certification in court, and thus Plant City would not bargain.

While the Boilermakers case was pending,[8] the Steelworkers began a union organizing campaign among the same employees of Plant City, in the summer or fall of 1960.

Granville M. Alley, Jr., an Appellee, Glenn L. Greene, Jr., and Paul A. Saad, both associates in the firm and agents of Appellees, rendered services to Plant City during 1960–1961. In 1960, Saad and Greene attended group meetings of Plant City employees. Saad spoke to the employees assembled at those meetings. The foreman of one of the four departments of Plant City in late 1960 was directed to split his work force and to send half of the force at a time for a meeting. The men were to sit in chairs facing the speakers and the foreman was to sit so that he could see the men's faces, so that he could report the expressions on their faces as the lawyers asked them questions.[9] Saad was introduced by a company vice president as a company attorney. The meeting lasted from 35 minutes to three quarters of an hour and Saad did most of the talking. Employee attendance at this meeting was compulsory. Saad told the employees that it

would be a year after the Boilermakers case, note 8, supra, was concluded before any new organizational activity could be carried out,[10] that the company was paying its attorneys a large sum of money each year and that if there were no organizational drive that money could be in the employees' pay checks. Saad also told the employees that they could lose jobs over trying to organize the union. Saad also discussed the cost of dues and said that the employees might not gain anything by joining a union.[11]

As had his activities at Plante, Saad's efforts at Plant City left no doubt in the minds of the employees who heard him that his purpose was to dissuade them from joining the Union.[12] Similarly, they resulted in an unfair labor practices proceeding before the Board.[13]

### Speed Sprayer Plant

Late in 1960, a union conducted an organizational drive among Speed Sprayer's employees. During 1960 and 1961, Appellees and Donald M. Hall, an associate in the firm and agent of Appellees, rendered services to Speed Sprayer and during this period Hall appeared and spoke at several meetings with employees. At a meeting, held early in November or late in October 1960, one

8. The NLRB found Plant City guilty of a refusal to bargain and filed a petition for enforcement of its order with this Court. We remanded the case to the Board for further proceedings, NLRB v. Plant City Welding & Tank Co., 5 Cir., 1960, 281 F.2d 688 and on October 16, 1961, the Board reconsidered its earlier decision and revoked the certification of the Boilermakers on technical grounds, 133 NLRB 1092.

9. At several times during the meeting, Saad took notes, presumably of the employees' questions or responses.

10. We note in passing the Government's assertion that this so-called "legal advice" was erroneous.

11. In answers to interrogatories, the Appellees admit that virtually all of these remarks were made by Saad at the meeting.

12. The foreman testified that the purpose of Saad's speech was "to discourage the

employees from joining the union." Two employees likewise testified. They also testified that after Saad left it was impossible to get union cards signed since the employes were afraid to talk about the Union.

13. In May, 1961, the Union filed an unfair labor practice charge against Plant City and Granville Alley alleging, among other things, that the comments made by Saad, but mistakingly attributed to Alley, constituted threats of economic reprisals in violation of § 8(a) (1). The Trial Examiner sustained some of the charges against Plant City, but dismissed the charges against Alley when several witnesses admitted that it was Saad, rather than Alley, who had made the speech. A motion to substitute Saad and the Appellees' law firm was denied as untimely. 1961, 138 N.L.R.B. at 842–43. The Board affirmed the Trial Examiner, 1962, 138 N.L.R.B. 839, and this Court affirmed the Board, NLRB v. Plant City Steel Corp., 5 Cir., 1964, 331 F.2d 511.

employee testified that Hall "told us that the union couldn't do anything for us and we had fair wage—we was getting fair wages and if we joined the union we would be just paying dollars and could be taxed money and some of the people was going to strike and we could be made to support them until they go back to work." A witness, called by the Appellees, testified that Hall "made it plain, you know, that the company could do more for us than the union." At another meeting, Hall talked about what the union was not good for and stated that the union was out after the employees' money. He also talked about the Kohler strike which had gone on for several years, and told the employees that they too could be thrown out on the street. He had talked about benefits which the Company gave and the union could not—Blue Cross and Blue Shield, paid holidays, and picnics. At a third meeting Hall talked on "What Can The Union Do For You." Hall told the employees that the Company could give them more benefits than the union could. At several of these meetings Hall, in addition to talking about the union, passed out to the employees a booklet entitled "What *Are* Union Promises." [14]

One of the employees, who had been called by the shop authorities to attend a meeting during working hours at which Hall had spoken against the union, was later visited by Hall, in the company of a foreman, at his home. This visit occurred in the evening, without any invitation from the employee.

Hall opened the conversation. Talking about what the union could do and could not do and generally speaking against the union, Hall told his reluctant host about an incident in which a truck driver who was a union man had broken into the home of another man's wife. He further talked about the cost of a union and that Speed Sprayer could have given its employees a raise if it were not for the union.

Another employee was also visited at his home by Hall, shortly before the election, in the company of a foreman. This visit was also in the evening and also without invitation. Hall asked the employee whether he thought things "would be all right now" that a foreman had been changed and whether he was "still going for the Union."

### Guild Industries.

In June 1960, organizational efforts at Guild were begun by the Carpenters Union. On August 3, 1960, the union filed an unfair labor practice charge against Guild which was disposed of by an informal agreement.[15]

A petition for election was filed by the union on October 7, 1960, and on October 26, 1960, a charge was filed by the union alleging that Guild had deprived an employee of overtime work because of his union activity. A hearing was held on the petition for an election on October 28, 1960. On December 15, an amended charge was filed by the union in the unfair labor practice matter, and an additional charge was filed, alleging a discriminatory discharge of another employee. Saad, on or about November 25, 1960, interrogated employees of Guild individually, after first swearing them, with the testimony being recorded by a court reporter. Saad's interviews "tore the plant" and upset the employees, some of whom felt that Saad's purpose had been to determine whether they had been supporting the union with the effect of

14. On the cover of this booklet was the legend:

"VOTE *NO*
*NO* UNION
*NO* STRIKE
*NO* DUES"

15. Guild agreed to post a notice promising that:
"We will not interrogate our employees concerning their membership in or sup-

port of FLORIDA STATE COUNCIL OF CARPENTERS * * * We will not threaten to close our plant * * * We will not threaten to refuse to recognize and bargain with the * * * union * * *."

The agreement was signed by Saad for Guild.

discouraging them from joining the union. On December 16, the union filed another charge, this time against Paul A. Saad as well as Guild, alleging that "by interrogating, threatening, and spying, and by other acts and conduct [Guild] and its attorney, interfered with, restrained and coerced its employees." On December 29, 1960, the NLRB Regional Director set aside the informal settlement previously reached and issued a complaint against the company and Saad.

Shortly thereafter, in early January 1961, a second interrogation of the employees took place. They were called into the office and asked questions by members and employees of Appellees' firm and then sworn and given questionnaires to fill out by the attorneys. On January 20, 1961, the prior complaint was amended to charge that Guild, by its attorneys, had on January 9–13, 1961, interrogated employees concerning their own union membership, activities and sympathies, and/or concerning the union membership, activities, and sympathies of other employees.

As to both instances of interrogation, the Trial Examiner found against Guild and Saad. 1961, 133 NLRB 1721, 1724. The Board affirmed the decision of the Trial Examiner. 1961, 133 NLRB 1719, amended 1962, 135 NLRB 971.

As to the first, reported, interrogation by Saad individually, this Court affirmed the decision of the Board as to Guild, but declined to hold Saad because "our holding in Lindsay [N.L.R.B. v. Lindsay Newspapers, Inc., 5 Cir., 1963, 315 F.2d 709, which also involved Appellees' law firm] came long after this interrogation, and was not a basis for either charging or holding Saad. For that reason, and because it was a question of first impression, we will not apply it to hold Saad here." N.L.R.B. v. Guild Indus. Mfg. Corp., 5 Cir., 1963, 321 F.2d 108, 112–113.

As to the second interrogation, we concluded:

The line between proper preparation of a defense in a proceeding of this type and conduct prohibited by the Act is fine indeed. In the main, much of what transpired in this interrogation was privileged on the basis of proper preparation but in sum, because of the posted company notice, the fact of the unsworn oral examination and the sworn questionnaire on the same questions, coupled with the anti-union animus present, it went beyond the pale of privilege. The Board was justified in holding it violative of § 8(a) (1) of the Act in that it constituted conduct tending to discourage union membership and activity. The employees might well have thought that this was one of the legal means which the company had promised to use. Although not necessary, this finding too buttressed the order of the Board as it related to the 8(a) (1) violation.

321 F.2d at 114.

### III.

From all these facts the District Court drew three common threads: (1) the Appellees were at all times representing the employers "on legal matters having to do with administrative or judicial proceedings or collective bargaining negotiations;" (2) in each instance, "the employees * * * involved were specifically advised and knew that the attorneys were acting as the attorneys for the respective companies;" (3) in each case, "the matters under discussion and the activities of the * * * attorneys were activities of a legal nature performed in the course of the attorney-client relationship." 236 F.Supp. at 26. With these broad, hardly descriptive, factual generalizations we do not take issue. We do, however, with the Court's conclusion that each, in and of itself, made the Act inapplicable and relieved Appellees of any duty to report. Though purporting to "rationalize the provisions of Sections 203 and 204 of the Act into a coherent whole," id. at 28, the Court concluded that each of its factual generalizations when matched to a separate provision of the Act removed Appellees' duty.

Primary reliance was placed on the exemption provisions, §§ 203(c) and 204. First, the Court held that Appellees were "expressly exempted" from the reporting requirements because of the "explicit provisions" of § 203(c) which were "obviously designed to exempt the activities of attorneys performing services *as attorneys in connection with* judicial or administrative proceedings." Id. at 30. (Emphasis added.) Second, § 204 excludes from the reporting requirements "activities occurring in performance of the *normal attorney-client relationship.*" Ibid. (Emphasis added.) Third, the exemptions of §§ 203(c) and 204 aside, the reporting requirements of § 203(b) were designed to reach only undisclosed activities, not the open activities of persons who the employees expressly knew were acting on behalf of, and being compensated by, employers. 236 F.Supp. at 33–34. A careful consideration of the legislative history of the LMRDA and a candid reading of the literal language of the relevant sections convinces us that each of these legal conclusions is erroneous.

### IV.

At the outset it is important to note that neither the Appellees nor the District Court ever asserted that the activities of Appellees were not those of a "persuader." Indeed, such an assertion would be impossible in light of facts set out in Part II. Without belaboring the point, we think it clear beyond doubt that Appellees pursuant to arrangements with their four employer-clients undertook, and, in fact, performed, activities with the object—and it is difficult to conceive of a case where the object could be more "direct"—of persuading the employees not to join the unions.[16] And though this is enough, as to Plant City (foreman watching expressions of employees at meetings and Saad taking notes), Speed Sprayer (Hall asking employee whom he visited at home whether he was still in favor of union), and Guild (interrogations of employees as to their union activity), it also seems clear that at least some of Appellees' activities had the object of supplying their clients with information concerning the union activities of the employees. These are the acts of a "persuader."

But the assertion is made that § 203(b) was not intended to reach disclosed persuasion. It is true, of course, that the McClellan Committee,[17] in which the LMRDA had its genesis, was primarily concerned with management-hired labor spies and undisclosed middlemen who engaged in espionage and deceptive persuasion.[18] But it is likewise true that from the first abortive predecessor of the LMRDA, the Kennedy-Ives Bill of 1958,[19] on through the finished legislative product, Congress did not attempt to outlaw these abuses by so-called "labor relation consultants." Rather the sanction was to expose them to publicity.[20] And it is clear that this exposure

16. The Government contends that the judicial determination that Appellees' interrogation at Guild constituted interference, restraint, and coercion within the meaning of § 8(a) (1) of the Labor Act, is conclusive—either under the doctrine of collateral estoppel or res judicata—on the lesser finding of persuasion required by § 203(b). Although we do not believe that such judicial determinations are irrelevant and immaterial, as contended by Appellees, it is unnecessary for us to pass on the Government's contention. The judicial determination of coercion aside, the evidence in this record belies any assertion that these activities of Appellees were not those of a persuader.

17. The Select Committee on Improper Activities in the Labor or Management Field, 86th Congress.

18. S.Rep.No. 1139, 86th Cong., 2d Sess. 855–58 (1960); S.Rep.No. 621, 86th Cong., 1st Sess. 119–20, 591, 671–72, 686 (1959); S.Rep.No. 1417, 85th Cong., 2d Sess. 184, 218–19, 298–99, 326–30 (1958).

19. S. 3974, 85th Cong., 2d Sess. (1958).

20. See generally Beaird, Reporting Requirements for Employers and Labor Relations Consultants in the Labor-Management Reporting and Disclosure Act of 1959, 53 Geo.L.J. 267, 269–70 (1965).

was to include not only the fact that the consultant was paid by management, but why he was paid, how much he was paid, and the practices he engaged in to earn his pay.[21] The aim was disclosure, but the method almost uniformly adopted to attain the end was reporting of these details, not the mere verbal acknowledgment by the consultant that he was hired by management as a persuader, a fact few employees would be too insensitive to grasp in its absence. Congress certainly knew how to exempt from the reporting requirements information which was already disclosed,[22] but it did no such thing as to the reporting requirements of § 203(b). The District Court wrongly concluded that disclosure, which according to its rationale would exempt nonlawyers as well as Appellees, is a substitute for what Congress expressly required—reporting.[23]

With § 203(b) thus covering Appellees activities on behalf of the four clients, the question as to the scope of the exemptions provided by § 203(c) and § 204 remains. In this regard the Act is something less than a model of statutory clarity. The problem with § 203(c) lies in the phrase "by reason of." What is its grammatical function? Its meaning? The Government gives the section this reading: nothing shall require any person to file a report by reason of his giving advice to or representing an employer before any court. Thus, if an attorney does more than give advice or represent his client before a court or agency, he is required to report. Making "by reason of" modify "report," the Government's reading emphasizes that "giving advice and representing" are the only exempted activities. Appellees would read the section in its normal grammatical sequence: nothing shall require a person to file a report covering services by reason of his giving advice to, or representing before a court, etc., an employer. With "by reason of" modifying services, Appellees would assign it the meaning "because of" or "in connection with." Thus, Appellees contend that any activities taken in connection with or arising out of representing or agreeing to represent clients are nonreportable. They, thus, emphasize that all their activities

21. In its report of the Kennedy-Ives Bill, the Senate Committee on Labor and Public Welfare made the following comments: "The committee believes that employers should be required to report their arrangements with these union-busting middlemen. * * * [L]arge sums of money are spent in organized campaigns on behalf of some employers for the purpose of influencing and affecting employees in the exercise of their rights * * *. Sometimes these expenditures are hidden behind committees or fronts. *Sometimes they are made in the open.* * * * *In any event,* * * * they should be exposed to the light of publicity *in the same fashion* that all union financial disbursements will be exposed." S.Rep.No. 1684, 85th Cong., 2d Sess. 7–8 (1958) (Emphasis added). We merely note in passing that there is no provision in the Act which exempts Unions from reporting their disbursements merely because they were disclosed when made.

22. For example, § 203(a)(2) requires employers to report all payments made to employees for persuading other employees "unless such payments were contemporaneously or previously disclosed to such other employees." No such exception appears in § 203(b).

23. In a very real practical sense reporting differs from mere contemporaneous disclosure. Though many of a persuader's reportable activities may be proper, some may be improper. Some may constitute unfair labor practices, as NLRB v. Guild Indus. Mfg. Corp., supra, illustrates, some may be unethical, some may be illegal (see LMRDA § 505), some may provide the impetus for additional legislation. While disclosure to the employee being persuaded that this is the mission of the identified "persuader" may attenuate the persuasion, the object of Congressional protection transcended the immediate employees. Unions, the NLRB, professional associations (e. g., Bar Associations), and the Congress were to have the benefit of the detailed filed reports which the Act requires to be made public. §§ 205(a), (c); 29 C.F.R. §§ 406.9, 2, 4(a)(2)(ii).

took place "while" administrative, judicial, or collective bargaining proceedings were occurring with regard to their employer-clients. They argue that any labor lawyer worth his salt would have done as much for his clients, that all of their activities were within the legitimate practice of labor law.

Whether Congress considered directly arguing to employees the economic, rather than legal, consequences of unionization, passing out antiunion propaganda, interrogating employees as to their union sympathies, visiting employees homes to persuade them to vote against the union, etc., within the "legitimate practice of labor law," it is clear that Congress meant for this type of activity to be reported.

## V.

When Congress convened in 1959, a number of bills had been prepared for introduction which were directed toward the elimination of the evils which had been revealed by the McClellan Committee hearings. The first to be introduced was S.505, introduced by then Senator Kennedy, Senator Ervin, and others, which was introduced January 20, 1959. I Leg. Hist. (NLRB) 29–79; [24] 105 Cong. Rec. 871.

S.505 provided in connection with labor consultants, essentially as does the Act as passed, that every consultant who undertakes activities when an object is, directly or indirectly, to persuade employees or supply an employer with information, shall file a report. The report required, however, was an annual one only. § 103(b), I Leg. Hist. (NLRB) 40–41. Section 103(c) of that bill was equivalent to Section 203(c) of the Act. I Leg. Hist. (NLRB) 41–42.

S.748, the Administration bill, was introduced on January 28, 1959, by Senator Goldwater and others. I Leg. Hist. (NLRB) 80–150; 105 Cong. Rec. 1259. Section 206 of S.748 required an employer to report annually payments made

to any person for the performance of an act whereby "(i) any employee may be subjected to restraint, coercion, or interference in his exercise of rights guaranteed by Section 7 of the [NLRA] * * *, or (ii) information with respect to the exercise of any rights referred to in clause (i) is obtained or is sought to be obtained from any employee and furnished without his knowledge and consent to his employer." I Leg. Hist. (NLRB) 102, 103. No separate report was required from the person doing the act.

Other bills introduced early in the Session included H.R. 4473, introduced by Congressman Barden on February 16, 1959, which, in § 209(d), specifically exempted attorneys from the requirement that persons providing labor relation consultant services file a report of every transaction involving coercing, restraining or interfering with the rights of employees, etc., imposed by § 209(b). I Leg. Hist. (NLRB) 230–33; 105 Cong. Rec. 2431.

On March 25, 1959, Senator Kennedy, together with Senator Ervin and the other sponsors of S.505 and others, introduced S.1555, which was favorably reported by the Committee on Labor and Public Welfare on April 14, 1959. I Leg. Hist. (NLRB) 338–96, 397–515; 105 Cong. Rec. 5137, 5877. As reported, S.1555 provided, in § 103(b), in virtually the exact language now enacted as § 203(b), that certain activities created an obligation to report. I Leg. Hist. (NLRB) 351; 105 Cong. Rec. 5976. The reporting requirement was somewhat different, however. Only an annual report had to be filed, which had to contain (1) the person's name, "(2) receipts of any kind from employers on account of labor relations, advice or services, designating the sources thereof, (3) disbursements of any kind, in connection with such services and the purposes thereof; and (4) a detailed statement of the terms of such agreement or arrange-

24. The legislative history of the Act has been compiled by the National Labor Relations Board and by the Department of Labor. They are cited herein as "Leg. Hist. (NLRB)," and "Leg.Hist. (Labor)," respectively.

ment." Section 103(c) of the bill was the same as § 203(c) of the Act. I Leg. Hist. (NLRB) 351–52, 105 Cong. Rec. 5976. The Committee Report noted, in describing the purpose of the bill, that:

> In some instances, the matters to be reported are not illegal and may not be improper. But only full disclosure will enable the persons whose rights are affected, the public and the Government to determine whether the arrangements or activities are justifiable, ethical, and legal.

S.Rep. No. 187, 86th Cong., 1st Sess. 5 (1959), U.S.Code Cong. and Admin. News 1959, p. 2321, I Leg. Hist. (NLRB) 401. In explaining the effect of § 103(b) and (c) of the bill (now § 203 (b) and (c) of the Act, so far as here material), the Committee noted:

> "Under section 103(b) every person who enters into an agreement with an employer to persuade employees as regards the exercise of their right to organize and bargain collectively or to supply an employer with information

concerning the activity of the employees or labor organizations in connection with a labor dispute would be required to file a detailed report. An attorney or consultant *who confines himself to giving legal advice, taking part in collective bargaining and appearing in court or administrative proceedings* would not be included among those required to file reports under this subsection. Specific exemption for *persons giving this type of advice* is contained in subsection (c) of section 103."

Id. at 12 U.S.Code Cong. & Admin. News 1959, p. 2328; I Leg. Hist. (NLRB) 408; Leg. Hist. (Labor) 506. (Emphasis added.) Further, as to the purpose of § 103(c), the Report stated that "[t]he committee did not intend to have the reporting requirements of the bill apply to attorneys and labor relations consultants *who * * * do not engage in activities of the types listed in section 103(b)*." Id. at 40, U.S.Code Cong. & Admin. News 1959, p. 2356; I Leg. Hist. (NLRB) 436. (Emphasis added.)[25]

---

25. Professor Archibald Cox's testimony before the Senate Subcommittee is revealing:

> I am familiar with three kinds of expenditures which should be publicized through compulsory reporting:
>
> * * * * *
>
> (2) Expenditures to a labor relations consultant or similar middle man in exchange for his undertaking to influence employees in the exercise of the rights of self-organization and collective bargaining or to furnish information concerning their activities. Payments for advice are proper. If the employer acts on the advice it may influence the employees. But when an employer hires an independent firm to exert the influence, the likelihood of coercion, bribery, espionage, and other forms of interference is so great that the furnishing of a factual report showing the character of the expenditure may fairly be required.

Hearings before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare on Labor-Management Legislation, 86th Cong., 1st Sess., 128 (1959). Also revealing is the fact that in reporting S. 3974, the Kennedy-Ives bill of 1958, which, in § 103(b) was

essentially the same as S. 505, the Committee noted:

> "Section 103(b) requires a labor-relations consultant to file a financial report upon his labor-relations activities if he undertakes to influence or affect employees in the exercise of the rights guaranteed by the National Labor Relations Act or to provide an employer with paid informer or any agency engaged in the business of violating such rights. *Since attorneys at law* and other responsible labor-relations advisers *do not themselves engage in influencing or affecting employees* in the exercise of their rights under the National Labor Relations Act, *an attorney* or other consultant *who confined himself to giving advice, taking part in collectively bargaining and appearing in court and administrative proceedings* nor [sic] would such a consultant be required to report. Although *this would be the meaning of the language of sections 103(a) and (b) in any event*, a proviso to section 103 (b) guards against misconstruction."

S.Rep.No. 1684. 85th Cong., 2d Sess., 8–9; Leg.Hist. (Labor) 390–91. (Emphasis added.)

The minority views expressed in the report called attention specifically to the fact that attorneys were covered by the bill, and noted that the minority was of the view, later adopted in the House Bill, that no disclosure of any activities of an attorney which fell within the scope of the legitimate practice of law was warranted, and that there should be no disclosure of the fact of the attorney-client relationship or the financial details thereof. It noted that the minority had offered amendments in committee to effect its views on this topic, but that the majority had rejected these amendments. Id. at 82, U.S.Code Cong. & Admin. News 1959, p. 2393; I Leg. Hist. (NLRB) 478–79; Leg. Hist. (Labor) 514–15.

During Senate debate, Senator Goldwater proposed two amendments. The first, to add a definition of "Labor relations expert, adviser or consultant," specifically excluded an attorney engaged in the practice of law when first proposed. 105 Cong. Rec. 6555–56; II Leg. Hist. (NLRB) 1161; Leg. Hist. (Labor) 221–22. Senator Goldwater himself, however, modified his proposed amendment to remove the exclusion of attorneys. Ibid. In clarification of the proposed amendment, Senator Kennedy asked:

"What effect would the Senator's amendment have on the requirement that attorneys be subject to the law when they are acting as Labor relations consultants?"

Senator Goldwater replied "they would be subject to the law." As so modified, the amendment was accepted by Senator Kennedy. Ibid.

The second amendment offered by Senator Goldwater was what is now Section 204 of the Act. Senator Goldwater gave his reason for the amendment: "I know that if I were involved in a situation in which an attorney was representing me, *and a report had to be made*, I would not want all of the intimate details of communications between the attorney and me to become public property."

(Emphasis added.) Senator Kennedy said, "There is no doubt in my mind that the bill which was originally drafted by lawyers adequately protected them. Therefore, I do not feel that the amendment * * * is wholly necessary." As Senator Dirksen put it, in the exchange which followed, "I think it is important to anchor the fundamental reason or purpose for protecting this relationship * * * —the safeguard of the lawyer-client relationship was designed not to safeguard or protect the lawyer, but the client." With this understanding, the amendment was accepted by Senator Kennedy. 105 Cong. Rec. 6558, II Leg. Hist. (NLRB) 1163–64, Leg. Hist. (Labor) 534–36.

S.1555 passed the Senate on April 25, 1959, with no further amendments here relevant. 105 Cong. Rec. 6745; II Leg. Hist. (NLRB) 1257, I Leg. Hist. (NLRB) 531–32, 577.

The House of Representatives adopted a different approach. The House Committee on Education and Labor reported H.R. 8342 on July 30, 1959. I Leg. Hist. (NLRB) 687; 105 Cong. Rec. 14853. In § 203, H.R. 8342 provided for reporting by labor relations consultants keyed to activities which interfered with, coerced, or restrained employees in the exercise of their rights. I Leg. Hist. (NLRB) 710–13. It also provided, in § 204, that:

"Nothing contained in this Act shall be construed to require an attorney who is a member in good standing of the bar in any State, or any client of such an attorney, to include in any report required to be filed pursuant to the provisions of this Act any information which is confidential between the attorney and such client in the course of a legitimate attorney-client relationship, including but not limited to the existence of the relationship of attorney and client, the financial details thereof, or any information obtained, advice given, or activities carried on by the attorney within the

scope of the legitimate practice of law."

I Leg. Hist. (NLRB) 713.[26]

After discussion on the floor of the House, an amendment by Congressman Landrum to substitute the text of H.R. 8400 for the text of 8342 was proposed, 105 Cong. Rec. 15702, II Leg. Hist. (NLRB) 1645, and adopted 105 Cong. Rec. 15859, II Leg. Hist. (NLRB) 1691–92. As thus amended, the bill was passed by the House on August 14, 1959, 105 Cong. Rec. 15891, II Leg. Hist. (NLRB) 1693–1702. The relevant sections of H.R. 8400 were exactly the same as those of H.R. 8342 as reported. I Leg. Hist. (NLRB) 640–44, 710–14.

In conference, of course, the Senate approach to the problem was accepted and that of the House rejected, and the provisions of the consultant reporting section of the Act are essentially those of S.1555. See Conference Report, H.R. Rep. No. 1147, 86th Cong., 1st Sess. 32–33, U.S.Code Cong. & Admin. News 1959, p. 2503, I Leg. Hist. (NLRB) 936–37. The conference bill was adopted by the Senate on September 3, 1959, 105 Cong. Rec. 17919, II Leg. Hist. (NLRB) 1452–53, and by the House on September 4, 1959, 105 Cong. Rec. 18127, 18153, II Leg. Hist. (NLRB) 1738–39.

### VI.

When we unravel these legislative threads, several patterns are sharply revealed. The first is that Congress, from the beginning to the end of the legislative process, was acutely concerned with the effect the reporting requirements would have on attorneys. Even in the House, where the Committee bill required the reporting only of activities which were intended to interfere with, coerce, and restrain employees, rather than those which were intended to persuade, and where the exemption of § 204 relieved both the attorney and his client from reporting any "activities carried on by the attorney within the scope of the legitimate practice of law," attempts completely to exempt attorneys (e. g., Congressman Barden's bill) were rejected. And in the Senate, Senator Goldwater was forced to abandon his attempt to exempt "attorneys engaged in the practice of law" and to concede that attorneys would be subject to the law when "they are acting as labor relations consultants."

The second thing clear is that the Conference Committee, in all respects save one, adopted the approach of the Senate in S.1555. While the House bill required the reporting of interference, coercion, and restraint, the Act requires the reporting of any persuasion.[27] While the

---

26. This provision is almost identical to that recommended by the American Bar Association. See Hearings on Labor-Management Reform Legislation Before a Joint Subcommittee of the House Committee on Education and Labor, 86th Cong., 1st Sess. 343 (1959) (statement of Harry L. Browne). The Committee reporting H.R. 8342 thus rejected Congressman Teller's proposal in H.R. 7811, 86th Cong., 1st Sess., § 707, that would have protected only against disclosure of "any privileged information."

The supplementary views attached to the House Committee Report, H.R.Rep. No. 741, 86th Cong., 1st Sess. 83 (1959), U.S.Code Cong. & Admin.News 1959, p. 2424, I Leg.Hist. (NLRB) 759, 841, noted that "the House committee has made reporting by employers and labor relations consultants the merest sham." Id. at 85, U.S.Code Cong. & Admin.News

1959, p. 2484; I Leg.Hist. (NLRB) at 843.

27. That is, of course, with the exception of those activities covered by § 203(c). The House bill contained no equivalent to § 203(c) for the obvious reason that the activities covered by that section could hardly be said to have the object of interference, coercion, or restraint. On the other hand, one can readily conceive of a situation where the giving of advice could be said to have the object of direct or indirect persuasion. At first the Department of Labor took the position that the reporting requirements covered an attorney's undertaking to draft speeches, letters, and other written material which are to be delivered or disseminated by the employer to employees for the purpose of persuading them with regard to the exercise of their rights.

House bill exempted the reporting by either attorney or client of any "activities carried on by the attorney within the scope of the legitimate practice of law," the Act exempts attorneys alone from reporting only "information * * * lawfully communicated to such attorney by any of his clients in the course of a legitimate attorney-client relationship." The only exception where the House approach was somewhat adopted by the Conference Committee is § 203(f). The Senate bill contained no equivalent provision.[28]

■ The third thing that is clear is that the exemption of § 203(c) is not, as Appellees contend, "as broad as the reporting requirement itself." Almost consistently, the purpose of § 203(c) was explained not to carve out a broad exemption[29] of activities which would otherwise be covered by § 203(b), but to make explicit what was already im-

plicit in § 203(b), to guard against misconstruction of § 203(b).[30] Generally it was felt that the giving of legal advice to employers was something inherently different from the exertion of persuasion on employees,[31] and § 203(c) was inserted only to remove from the coverage of § 203(b) those grey areas where the giving of advice and participation in legal proceedings and collective bargaining could possibly be characterized as exerting indirect persuasion on employees, see note 27, supra, not to remove activities which are directly persuasive but indirectly connected to the giving of advice and representation.

For the purposes of this case, it is unnecessary for us to ascertain the precise location of the line between reportable persuader activity and nonreportable advice, representation, and participation in collective bargaining.[32] We conclude only that not everything which a lawyer

See Beaird, supra, at 294. Upon reconsideration, the Department conceded that such activities by attorneys, though admittedly intended to have a persuasive effect, came within the "advice" exemption of § 203(c). Donahue, Some Problems Under Landrum-Griffin, 1962 Proceedings of ABA Labor Relations Law Section 45.

28. Section 203(c) of H.R. 8400, the House committee bill, provided:

"Nothing contained in this Section shall be construed as an amendment to, modification of, *or limitation upon*, the rights protected by Section 8(c) of the National Labor Relations Act, as amended, *nor shall any person be required to file a report with the Secretary in regard to any matters protected by Section 8(c) of such Act.*" (Emphasis added.)

Section 203(f) of the Act eliminated the italicized words.

29. If the exemption from the activities covered by § 203(b) were broad, so would be the exemption from the reporting requirements, for § 203(c) pertains to all persons, not just to attorneys.

30. The Senate Report accompanying S. 1555 in explaining the effect of § 203 (b) noted that "an attorney * * * who confines himself to giving legal advice, taking part in collective bargaining and appearing in court or administrative

proceedings would not be included among those required to file reports under *this subsection*" (Emphasis added) and in explaining the purpose of § 203(c) noted that it exempted attorneys "who * * * do not engage in activities of the types listed in section 103(b) [now § 203(b)]." And the Committee Report accompanying the Kennedy-Ives bill of 1958 likewise explained that the exemption of an attorney "who confined himself to giving advice, taking part in collectively bargaining and appearing in court and administrative proceedings * * * would be the meaning of the language of sections 103(a) and (b) [203(a) and (b)] in any event" and that § 203(c) merely "guards against misconstruction." All this explanation indicates that § 203(c) was not intended to limit in any substantial manner the coverage of § 203(b).

31. See note 25, supra.

32. For instance, it has been suggested that the line be drawn between communication with the client and direct contact with the employees. "* * * [O]nly when the attorney has direct contact with certain persons, including employees, other than his client may he be required to file reports and make disclosures." Lang, Reporting Requirements in General, in SLOVENKO 369, 376. "* * * [T]he services ordinarily performed by an attorney for his labor clients will

may properly, or should, do in connection with representing his client [33] and not every activity within the scope of the legitimate practice of labor law is on the nonreportable side of the line. At least some of Appellees' activities on behalf of each of their four clients—no matter how traditional, ethical, or commendable—were those of a persuader.

It is likewise unnecessary for us to determine the precise meaning of § 203(f).[34] In view of the fact that the Act provides a considerably narrower proviso than the one contained in the House bill, see note 28, supra, we cannot accept Appellees' assertion that the pro- tection provided by § 203(f) is "as broad as language can possibly make it." Appellees argue that requiring them to report their persuasive arrangements interferes with their clients' unfettered right under § 8(c) of the NLRA to express "any views, arguments or opinions" to employees. This interpretation of § 203(f) renders the reporting requirements of § 203(b) meaningless, since it is difficult to conceive of any kind of persuader activities which do not consist of expressing the employer's views and opinions and since § 203(f) applies to employers and nonlawyer persuaders as well as to attorneys. There is nothing

---

entail no reporting obligations on the part of either the attorney or client. It is only when the lawyer departs from his customary functions of advising and representing in legal proceedings that he may have to report. If he should undertake personally to speak to his client's employees and urge them not to join a union which is trying to organize them, he would have to file the report called for by section 203(b)." Loomis, Employer and Consultant Reporting Requirements, in SLOVENKO 391, 399. "It is clear that if a lawyer undertakes on behalf of a client to address a meeting of the client's employees, or to write a letter to the employees over the lawyer's signature, urging the employees not to sign union cards being distributed at the client's door, or not to vote for a union in the coming representation election, the lawyer has engaged in reportable activity. * * * A reasonable construction of 'advice' would hold it applicable to all activities of the lawyer in which it is contemplated that the client will be the ultimate implementing actor and in which the client retains the power to accept or reject the activities of the lawyer. As a corollary, advice would not include activities in which the lawyer or his agent implement the activity by interposition between the client and his employees, * * *." Bernstein & Sullivan, Lawyer Reporting and the Attorney-Client Privilege, in SLOVENKO 410, 413–14.

33. It is significant to note that the various legislative committees explained the § 203 (c) phrase "representing * * * such employer before any court, administrative agency, or tribunal of arbitration" as consisting of "appearing in court or administrative proceedings." See note 29, supra. Whether Congress intended only to exempt the actual appearance—and the Government does not contend that the exemption is so limited—there is no indication that the exemption extends to any and every act of representation merely because it happens to be contemporaneous with, or remotely connected to, judicial or administrative proceedings.

34. The Department of Labor interprets this subsection as having no effect on the reporting requirements:
"While nothing contained in section 203 of the Act shall be construed as an amendment to, or modification of the rights protected by, section 8(c) * * *, activities protected by such section of the said Act are not for that reason exempted from the reporting requirements of this part and, if otherwise subject to such reporting requirements, are required to be reported. Consequently, information required to be included in Forms LM–20 and 21 [the 30-day and annual report forms] must be reported regardless of whether that information relates to activities which are protected by section 8(c) of the National Labor Relations Act, as amended."
29 C.F.R. § 406.6 (1966). See generally Bureau of Labor-Management Reports, U.S. Dep't of Labor, Technical Assistant Aid No. 4, Guide for Employer Reporting (1960); Bureau of Labor-Management Reports, U.S. Dep't of Labor, Technical Assistance Aid No. 6, Employer and Consultant Reporting (1963). For a defense of this interpretation, see Beaird, supra, 53 Geo.L.J. at 288–90. For a criticism, see Iserman, The Secretary of Labor's Regulations for Employers, in SLOVENKO 404–07.

in the legislative history to indicate that § 203(f) was intended to have this enervating effect. It is enough to say that Appellees cannot escape all reporting requirements simply by virtue of § 203 (f). Section 203(f) grants full right to the employer to give voice, either directly or through agents including attorneys, to views protected by § 8(c). But if those statements are made by agents, the reports must be filed.

■ Likewise, it is unnecessary at this time to determine the precise reach of § 204. It is clear from both the legislative history and the language of this section that its provisions come into play only once a report is "required to be filed." Here we merely decide that a report must be filed and do not attempt to delineate its contents. The Government argues that neither the 30-day nor annual reports called for by § 203(b) require the Appellees to reveal any information which was communicated to them by their clients in the course of the attorney-client relationship, and that it is quite willing, at the appropriate time, to respect a proper claim of privilege predicated on § 204.

■ But since any such reports to be meaningful must include as a bare minimum the name of the client, the terms of the arrangements, and the fees, we deem it appropriate to indicate our views as to what information § 204 does *not* prevent the disclosure of. As to the four clients on whose behalf Appellees performed persuader activities, we conclude that in spite of § 204 Appellees must report their names and the fees received for any persuader arrangements.[35] They must also describe the general nature of the activities they undertook pursuant to such arrangements.[36]

■ Several factors compel this interpretation. The first is a legislative intent to make § 204 roughly parallel the common-law attorney-client privilege. By the weight of authority, such privilege (1) belongs to the client and is not intended to protect the attorney;[37] (2) cannot be invoked to prevent disclosure of the client's name or the fees actually paid;[38] (3) protects the disclosure of confidential information only.[39] The second is that in spite of this general intention to "anchor," as Senator Dirksen put it, the purpose of § 204 in the protection of the client, not the lawyer,

**35.** It may often be the case—and it may be so determined here on remand—that an attorney will in a single agreement for a single fee undertake to perform both persuader and nonpersuader activities. In such a case, we believe that the entire fee must (but perhaps with appropriate explanation and allocation) be reported in the annual report as payments are made. This gives meaning to the requirement of § 203(b) that the annual report contain a statement of "receipts of any kind from employers on account of labor relations advice or services." To the extent that an attorney must report fees for nonpersuader activities on behalf of a client for whom he also performs persuader activities, this interpretation also adopts with respect to such clients, at least, the Government's position that the performance of persuader activities triggers the necessity to report nonpersuader activities otherwise exempted by § 203 (c).

**36.** The terms of an agreement or arrangement, without more, might well be considered a privileged "communication" from the client to the attorney. But where, as here, the agreement has been executed, partially or completely, the nature of the activities actually performed by the attorney can hardly be characterized as a "communication" from his client. In this case Appellees are required to report the general nature of what they did, not what they were "told" to do. Without intimating decision, we would point out that if agency of the attorney for acts performed is denied by the employer-client the privilege as to instructions, express or implied, might not prevent inquiry.

**37.** McCormick, Evidence § 96, at 195 (1954); 8 Wigmore, Evidence § 2321 (McNaughton rev. 1961).

**38.** McCormick, supra, § 94, at 188–89; 8 Wigmore, supra, § 2313 at 609.

**39.** McCormick, supra, § 95; 8 Wigmore, supra, § 2311.

§ 204 by its terms may be invoked only by the attorney. Section 203(a) still requires the employer-client to report all persuader arrangements. This can only mean one of two things. Either Congress implicitly intended to honor the employer-client's invocation of the privilege as a barrier to reporting—for it would be meaningless to allow the attorney to keep secret what his client must report—or Congress intended § 204 to protect only that information which the *employer* is not required by § 203(a) to report. We prefer the latter explanation as being most consistent with the legislative utterances which accompanied the adoption of § 204.[40] We conclude, therefore, that as to each persuader arrangement, the Appellees must report the name of their client, the receipts and disbursements pursuant to such arrangements, and the general nature of their activities on behalf of these clients. These activities cannot be considered as confidential information communicated from the clients to Appellees.[41]

### VII.

Thus far the Court is of a single mind. At this point a division arises whether the report must include services performed for nonpersuader clients.

 In holding that Appellees need not file even the 30-day reports on behalf of their four clients, the District Court found it unnecessary to pass on the Government's contention that the perform-ance of persuader activities on behalf of these clients triggered the necessity to file annual reports covering all labor relations services including those rendered to clients for whom Appellees undertook no persuader activities. Nevertheless, the District Court alluded to this contention to exhibit the Government's "strained interpretation of the entire Act" and found it to "play havoc with the obvious purpose of Section 203(c) (as well as Section 204)." 236 F.Supp. at 34 n. 4. The Government urges that this dicta is contrary to the subsequent holdings of the Fourth Circuit in Douglas v. Wirtz, 4 Cir., 1965, 353 F.2d 30, cert. denied, 1966, 383 U.S. 909, 86 S.Ct. 893, 15 L.Ed.2d 665, and another District Court in Price v. Wirtz, N.D.Tex., appeal pending before another panel of this Court [No. 22630]. In both of these cases the attorneys conceded that they had performed persuader activities and agreed to file the 30-day report as to such activities, the sole question being whether they also had to file annual reports as to labor relations services to clients for whom they performed no persuader activities. In both cases it was held that they did. The majority of this Court disagrees and with deference declines to follow the holding of the Fourth Circuit.[42]

A contrary conclusion would mean that when an employer retains an attorney solely to perform nonpersuader activity (e. g., giving advice or representation in

---

40. Senator Goldwater in proposing § 204 expressed the fear that "If I were involved in a situation in which an attorney was representing me, and a report had to be made, I would not want all of the intimate details of communications between the attorney and me to become public property." We believe the Senator was referring to a situation in which he had retained the attorney to perform nonpersuader activities in view of his concession in another context that attorneys performing as persuaders would be subject to the reporting requirements. This interpretation of § 204—that it protects from disclosure by persuaders of nonpersuader activities performed for employers who are not required to report

—supports the majority's conclusion in Part VII, infra.

41. Especially is this true in light of Appellees' repeated assertion that they were at all times performing these activities openly on behalf of their four clients.

42. The dissenting member of the Court basing the dissent from this part (Part VII) of the Court's opinion on the reasons stated in Douglas v. Wirtz, supra, would hold that the performance of persuader activities requires an annual report of all labor relations advice and services on behalf of all clients. This is the price, albeit perhaps a high one, for lawyers engaging in persuader activities.

court proceedings) and when that attorney subsequently engages in persuader activities on behalf of another employer, the attorney's nonpersuader arrangement with the first employer would be subject to complete disclosure. In the Court's view the purposes of the reporting requirements, as revealed in the legislative history, do not justify such a harsh result.

First, it is true that § 203(c) can be read, as the Government does, to deal only with those activities which do not trigger the necessity for filing a report rather than with those activities which need not be covered in a report which is otherwise required to be filed. But in explaining this section, the Senate committee report on S.1555 noted that it "[p]rovides that no employer nor any other person shall be required to file a report *covering* the giving of advice by such person to such employer, representing the employer before any court * * *." S.Rep.No.187, 86th Cong., 1st Sess. 40 (1959), U.S.Code Cong. & Admin. News 1959, p. 2356, I Leg. Hist. (NLRB) 436. (Emphasis added.) Second, S.1555, as reported, required a single annual report containing (1) the name of the persuader, (2) receipts of any kind on account of labor relations advice and services, (3) disbursements of any kind in connection with such services, and (4) a detailed statement of the terms of such agreement. There was no indication that items (2) and (3) were to pertain to agreements other than those referred to in item (4).[43] On the floor S.1555 was amended to require a 30-day rather than an annual report. In Conference, it was agreed to require both a 30-day and an annual report, with items (1) and (4) being required in the 30-day report and items (2) and (3) in the annual one. It does not appear that the annual report was to cover agreements not covered by the 30-day report, the sole concern being the timing of the reports.

Third, the primary purpose of § 204 was to protect employer-clients, who do not enter persuader agreements and who thus do not have to report under § 203 (a), from having their affairs disclosed by attorneys who, as persuaders for other employers, are obligated to report. See note 40, supra, and accompanying text.

On the other hand, of course, is the fact that the potent weapon to Congress was glaring publicity. One might argue that Congress thought an effective way to discourage lawyers engaging in persuader activities was to disclose to the public intimate details of all of counsel's labor clients, both persuader and nonpersuader. In time clients who did not believe in such tactics would retain other counsel to achieve secrecy. The difficulty with this is that it does not distinguish between nonpersuader clients who do from those who do not know of the attorney's persuader work. Nor is it limited in point of time. A client could employ counsel at a time when the attorney performed no persuader work for anyone. And yet in the Government's reading, the first purposeful (i. e., non accidental) persuader work would trigger during the period the reports for all labor clients, new and old, aware or ignorant of these Congressionally discredited activities. We cannot believe that Congress could have intended to visit such consequences on such non involved employers.

## VIII.

■■■ As thus construed, we conclude that the reporting requirements do not infringe on any of Appellees' constitutional rights. Their free-speech, first amendment challenge is foreclosed by United States v. Harriss, 1954, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989. In view of the fact that this is not a criminal prosecution for wilful failure

---

43. The language "receipts of any kind on account of labor relations advice or services" seems to have reference to receipts for nonpersuader activities undertaken pursuant to persuader agreements, rather than to receipts for activities undertaken pursuant to wholly nonpersuader agreements. See note 35, supra.

to report and that Appellees' conduct clearly was that of a persuader, their contention that the reporting provisions are void for vagueness is equally meritless.

■ In reversing the judgment below, we do not attempt to blueprint, or even indicate, what action and relief will be appropriate upon remand. Having our view of the relevant statutory provisions and controlling principles, the District Court will have considerable leeway in disposing of Appellees' prayer for a declaratory judgment, the Government's request for an injunction, and in framing any injunctive orders to be entered. After the Government is allowed to complete its discovery, it may well be that as to a number of decisive issues, if not all, it will be entitled to full or partial relief by summary judgment, including appropriate injunctive, declaratory (or both) orders. On the other hand, as a minimum, Appellees are entitled to a declaratory judgment that they need not report activities on behalf of clients for whom they performed no persuader activities. To the extent persuader activities for one or more clients is not made out as a matter of law (on summary judgment or otherwise) Appellees are likewise free within the limits of F.R. Civ.P. 52(a) to urge the trier of fact to find that no persuader activities have been performed. Relief would have to be adopted accordingly.[44]

Reversed and remanded.

JONES, Circuit Judge.

I concur in the result and in so much of the opinion as supports the result.

---

44. We would, as we often have, emphasize that declaratory relief ought not to be based on academic, theoretical or hypothetical situations which might arise in the future. City of Houston v. Standard-Triumph Motor Co., 5 Cir., 1965, 347 F.2d 194, 198 and cases cited in note 9; Corsican Productions v. Pitchess, 9 Cir., 1964, 338 F.2d 441, 443; Shull v. Pilot Life Ins. Co., 5 Cir., 1963, 313 F.2d 445, 447.

With the infinite variables of day to day labor relation problems it would be risky to try to spell out in detail what is, or is not persuader activity, just what should, or should not be reported, etc. This might unduly subject the employer-clients (or counsel) to the lurking threat of contempt or, on the other hand, unduly restrict public authorities in the enforcement of the Act and the fulfillment of Congressional policies.